Good morning, Your Honors. My name is Christopher Vaughn. I represent Kimberly McKinnish in this appeal. As you know, the initial question, the big question in this case, is whether plaintiff's supervisor was her supervisor. The Supreme Court in Vance v. Ball State greatly narrowed the definition of supervisor when it came to sexual harassment cases such as this. It's obviously our position that David Duncan was, in fact, Ms. McKinnish's supervisor. Now, in the district court opinion, the district court state for some reason... Well, based on what? Is it your position that he was her supervisor? It's based on our belief or the facts in the record that show that Mr. Duncan controlled her hours. In other words, he controlled whether she worked at all. It was more than just setting her schedule or saying, today you work in this position or that position. It was whether she worked at all. He controlled whether she came in and earned an income, essentially. He also had some limited power to discipline, and he could recommend, he could not make a decision on a proposed removal, but he could propose removal of people in Ms. McKinnish's... Is it in the record that he had the power to decide whether or not she worked at all? I believe so, sir. It's in our appeal brief, and we have citations... No, no, I mean as far as evidence is concerned. It is her, the position description for Mr. Duncan as a supervisory customer service, supervisory customer service says that he has the ability to establish work schedules and allocate work hours. So, as a transit... That doesn't necessarily mean he decides whether or not she works. Well, Ms. McKinnish was a transitional employee. She wasn't a full-time regular employee, so she was essentially a fill-in for other carriers when they either had too much work to do or a carrier was out. There were four, there were a total four transitional employees, and Mr. Duncan could decide whether, which of the four to call in to support the other carriers or to fill in for a carrier that was not working that day. She paid by the hour? She was, yes, sir. Is that in the record? I believe so. Are the rates in the record? The rates are not in the record. I don't believe. Can we take judicial notice of the hourly rate? I'm sorry? Can we take judicial notice of what the hourly rates were? I don't know. Aren't there, yeah, there are some pay slips and things in here. I don't recall that there are any pay stubs in there. But she was, she was an hourly employee, and in fact the defendants... And there's some overtime involved here, right? There is overtime, but that's... She got overtime, and is that at the same rate? There's an overtime time and a half, or double time, or what is it? It's time and a half, but the real issue is just the 40 hours is generally the issue. Well, I thought that she was claiming that this fellow had the power to, and did, cut her hours back in certain situations, and run her hours up in other situations. I don't know whether she cooperated with him or not. That's correct, but... Or exchanged sufficient text messages with him. That's correct. The post office is pretty strict with their overtime, so it's really a matter of whether she was working 20 hours, or 10 hours, or 40 hours. And that's one of the reasons they have the transitional employees, is so that they can bring them in to keep the other carriers from working overtime. So, really the issue is just straight time between zero hours and 40 hours, depending on her cooperation. When she says that her hours were cut, other than her just saying that, is there any documentation, as far as pay records are concerned, that shows fewer hours worked during this pay period versus more hours worked during a later one? There is deposition testimony from both Mr. Duncan and the plaintiff that establishes that, in fact, when she cooperated, she earned more money during... Well, Duncan didn't testify to that, did he? The defense position, he may not have testified. The defense position is that she earned more money during the year that this was all going on, than she had in the years previous. Well, that shows her hours are not being cut. Well, that's our position, is that she cooperated, and therefore she was rewarded for cooperating. Well, my question is, what shows her hours were cut when she says she wasn't cooperating? What documentation is there? There is evidence that there was a time period when he first became her supervisor, when she was not cooperating, that she was called to work at 9.30 or 10 in the morning, as opposed to 7. Right, but is there any documentation for that? Just her testimony. Time record. Just her testimony. Yes, sir. There are other people's testimonies, too. That is correct, sir. It wasn't just her testimony. That's correct, there are other carriers, as well, that testified that her hours were lessened, especially when he first became her supervisor, when she wasn't as cooperative. But he said, as I understood it, that she still got as many hours per week as everybody else did. Even coming in later, she got as many hours, and I didn't see anything to rebut that. That was her position. She and the other carrier said that that was not the case, but yes, sir, that is what he said. What she said is that her work hours remained fairly constant during this time. That's what she testified to at the JA at page 74. And that she made, I think I made more money than I ever made in 2010. That's correct, Your Honor. That was after, because of the cooperation with the… But her hours were fairly constant, she said. Right, once she began cooperating over the first couple of weeks of him becoming her supervisor, she got the message that she needed to participate, and she did. So for the overwhelming majority of the time that he was her supervisor, she did earn… So this started right at the beginning, right away when he became her supervisor? When she first, he was already there, and she transferred into this post office that he was working at. Yes, ma'am. If we looked at these time sheets that are in the record, is there anything that we should see in those that is favorable to your client? I don't know that there is, Your Honor, because she started essentially almost from the beginning. Once she, once those first couple of weeks hit, and she realized that this is the way it was going to be, she did work pretty consistently thereafter because of her agreeing to exchange… I couldn't find anything that would tell me how long a period of time she was having her hours cut according to her testimony. I couldn't tell if it was a week, two weeks… It was just a very short period of time. How short? Just a matter of a few weeks. Is that in the record anywhere? I… That you recall? I believe that it is, but I can't cite that. I apologize. Okay. Let me ask you this question. Let's suppose he is a supervisor and that there's strict liability, and this goes on hypothetically for a year or two. Is it your position that the post office, the employee would have liability for an extended period of time even though, or for a long period of time, even though there are opportunities available to her to report this and get it stopped? It is, Your Honor, because they were aware that Duncan had previously harassed another employee. So this was not, while Ms. McInnish did not complain herself, another employee did complain to Duncan during this same time period that Duncan was harassing her, not to the degree of Ms. McInnish, but in a similar manner. What if it goes on for five years? I mean, what if it goes on to the point that it's just unreasonable to impose liability when she clearly has a way to stop it and doesn't do so? Sure. You're, I mean, correct. You're fair enough. I mean, you can't just build up a case for At some point, there's got to be an end to it that it just can't go on forever where the employee declines or refuses to take advantage of the reporting system. Sure, and I don't disagree with that. This case was about a year. I don't know that that's unreasonable, but you're correct. I mean, if this went on, you can't just build a case for ten years and then on your, I'm retiring, I want my ten years worth of, that would be unreasonable. But the reporting system did work for the other employee you're talking about. It did not. Nothing happened to Duncan. Because the employee, when they went, they talked to the employee that complained, they tried to talk to her and she, they talked to the supervisor, he stopped, then they went back and talked to her and she said there's no more problem. Correct. So how is that not working? He stopped for about two weeks and then the supervisor that she complained to left and when that supervisor left, he began harassing her again. What, began harassing Ms. Meadows again? That's correct. Where is that in the record? That's in her letter, in her statement that she wrote in the record. That after, it was about a two week period and in fact Mr. Duncan told her, are you going to tell on me again? It was a statement, it was in the statement that she wrote in the record. And did she tell on him again? She did not. Because it worked the first time. She did not. So how is that the post office's fault? Clearly the action that they took in taking him out to lunch and telling him to stop doing that did not work. That was not sufficient. It didn't deter him, it deterred him for two weeks and then he went right back up where he left off. She also says that when she didn't cooperate you had her come in late and gave her the worst routes. Correct. What's the worst routes do for you? They're more difficult. That means they had to walk more? That's correct. They're just more difficult. The easier routes are ones where there's one big box and you can fill everything at one time as opposed to having to walk from building to building to building. It's our position that that's a tangible employment action. Honestly that is a little more tenuous than the ability to control her hours. Well not a claimant of that standing alone carries the day. You're just saying that adds to it. Correct. The real issue here is the controlling of her hours. The hours is the central claim. Yes sir. But are you able to say how many hours are involved? How do you deal with that? Do you just say more? Can you quantify? It's hard to quantify. She works more than... Don't you have to do something to quantify it to show how much money was involved? Don't you have to show us what the hourly rates were? Well in this case she earned more money not less so it's not a matter of being able to say I would like to recover X amount of dollars because that's money I did not earn during this time period. In this case she did earn more money which can still be a tangible action. This is just a claim for the compensatory damages for the sexual harassment that went on not for any loss of hours because it was such a minimal amount of time that she lost hours until she joined in on what he wanted her to do. Are you taking the position that assigning her to a bad route is not giving her an assignment with significantly different responsibilities? It's not significantly different. It's more difficult but it's still delivering the mail. So I don't know that we can honestly take a position that giving her the bad route is significantly different in her duties. I mean she's delivering the mail on the good route she's delivering the mail on the bad route. I think it just goes to show sort of the type of harassment or the pressure that she was under to participate in his request for these text messages. That in and of itself I don't, I mean she's delivering the mail either way. Well you don't think there's a difference between walking one mile to deliver the mail and walking 12 miles to deliver the mail? I do and it is more difficult and that was our position in a brief but you know as far as her duties Are you changing your position then? I'm not changing our position I'm just it is still delivering the mail at the end of the day. We think it's punishment for not cooperating but it is still delivering the mail. It's our position that it goes to show again the treatment or harassment that she was suffering the reasons that she was fearful of complaining is she would be punished when she didn't cooperate and the punishment would be things like lesser routes or more difficult routes so I mean I think it goes to the mindset of why she was entangled in this situation. Okay. Thank you Mr. Bowen you're out of time but you've got some time remaining after we hear from Mr. Taylor. Mr. Taylor? I'm Assistant United States Attorney Paul Taylor I represent the Postmaster General in this sexual harassment case The District Court granted summary judgment to the Postmaster looking at Vance v. Ball State and determining that David Duncan was not a supervisor under the standards set by the Supreme Court and the plaintiff did not suffer a tangible employment action in any event and that this is exactly the type of case that the affirmative defense of Ellerth and Farragher should apply to We review all this de novo right? Yes it's a de novo standard In Vance What's his job description call him? The job description calls him a supervisor of customer service That's the title right? Yes it is So the job description says he's a supervisor But Vance went to great lengths to talk about what supervisor means and what it doesn't mean The Postal Service designated him in his job description as a supervisor and he did have some control over her hours and the routes under this evidence You wouldn't dispute that would you? No And she said when I didn't cooperate with him he had me come in late 10 o'clock in the morning rather than 7 So now we're getting So that's cutting her hours right? Well not necessarily He explained in his second declaration that if you're going to work Well we have to take the facts and the light most favorable to her Don't we? At this stage summary judgment she gets the evidence construed in her favor Yes She says that he cut my hours So we have to believe that for purposes of this case on appeal Yes but she never says he cut her hours below 40 in a week and she never said how many and the test is not whether he cut her hours it's whether there was a significant change in her employment benefits and on this record you don't have any evidence What's the hourly rate? I don't know it's not in the record I thought it was in here I thought we figured it out I take that back In the joint appendix It's like $25 and the time and a half was like $38 or above 40 and she averaged like 7 I don't recall She had 7 hours of overtime Right Anyway There is stuff in there about that Well I'd like to address that Vance came out in June after this case was filed in March and so there is very little law about this until the 10th circuit ruled in McCafferty which I cited in my brief which the district court cited in its opinion where they said just the ability to control hours, bringing someone in to work an extra shift or sending them home early, that in itself does not meet the standard under Vance which Vance got rid of the negative of controlling day-to-day activities the dissent in Vance said gone is the day-to-day control and then we talk about the miserable walking routes, well Vance said you know what, a co-employee with control over day-to-day activities can make your life unbearable that's still not vicarious liability that's negligence so changing the route doesn't matter what matters is What if you have the ability to dock their pay? I'd like to talk about that Good That's why I asked the question You know the 7th circuit in Vance was affirmed by the Supreme Court the Supreme Court changed the standard in the 7th circuit they said you're going to be a supervisor for vicarious liability if you have the ability to hire, fire, promote reassign with significantly different responsibilities cause a significant change or discipline, very interesting the word discipline drops out of the standard when the Supreme Court restates what the standard is going to be So you're saying the Supreme Court didn't refer to the fact that the ability to dock a person's pay I'm going to get there I told you I'm glad you asked that question So discipline drops out of the standard and then it's relegated to footnote 9 where they talk about they say a supervisor imposes discipline might meet the standard we're adopting today if there is a significant economic impact and then a little later they said a co-worker for instance, cannot dock someone's pay. Dock implies discipline. You go home for the rest of the day, you've got a bad attitude you're not working fast enough, you're an hourly worker you're going to lose some pay The joint appendix at 114 Why don't you get right to my question If a person has the ability to dock another person's pay is that evidence they are a supervisor? I would say it depends on if it causes a significant change in job benefits That's the standard. The Supreme Court did not put dock in the standard. They said is there a significant change in benefits is there a power to cause a significant change in benefits You don't think they did that in Ellerth or in Vance? That they didn't say that docking a person's pay is evidence that they are a supervisor? You know they got close to that Your Honor Those decisions predate Vance and Vance now comes down with this tight list and they throw the docking comment which they cite paragraph This is Vance Co-workers the court noted can inflict psychological injuries by creating a hostile work environment but they cannot dock another's pay nor can one co-worker demote another citing Ellerth And when the Supreme Court says that you don't think they are saying that a person who has the ability to dock pay is not a supervisor? They might be if it causes a significant impact How much do you dock them? Is that what you are saying? They are a co-worker but if they dock them 10 days is there a supervisor? Are you saying it depends on how much they dock them? It depends on if you want to pull So there is a de minimis rule in there for you? Is that what you are saying? I'm looking at the standard which doesn't talk about docking. It says a significant change in pay a significant change in benefits and they do put that language in later which when you look at a Supreme Court decision Even a few hours might be significant to the plaintiff It might not be significant to the post office but it might be significant to her if he changed her hours just a couple hours a week I think what we are getting at did he change her we don't know what that was and I'm relying on McCafferty which says that being able to rearrange someone's schedule they work more or less You don't know whether he had the power you just said we don't know To dock That's not in his job description To change her work schedule Yes but docking has a disciplinary component to it This is a scheduler He has her come in three hours later than everybody else He's reduced her hours by three hours in that day She said he did it for a while until she started cooperating Well he explained that by saying she was working a six day week so she has to come in later and then she says I worked a regular 40 hour week the whole time She's not brought one page to say I lost 10 bucks this week Instead she testified I worked a regular 40 hour week Now that's going to get into the point Did he in fact impose a tangible employment action We're still trying to figure out does he have the power to do this and I submit that the docking Y'all can interpret the Supreme Court decision a lot better than me but they put this list they throw discipline down into a footnote they make this parenthetical comment about docking which implies that yes they think docking is going to rise to the level of a supervisor but we don't have docking or discipline in this job description and there's no evidence that he in fact docked anybody's pay Aren't they pretty close You know you can dock their pay or you can dock their hours they work I mean when you control how much money they're going to get for their work or whether or not they are going to work isn't that the same harm basically to the employee It is the same harm but when the Supreme Court throws out the word dock I submit that there's a disciplinary aspect, a disciplinary power and what we're trying to get at the whole point of Vance and vicarious liability you know they say Title VII is a preventive statute it adopts the law of avoidable consequences and in Farragher and Ellert they're saying we're going to create this balance of responsibility if you get there if you get to the affirmative defense where you have to have a policy and it has to work and the employee has to be responsible and use the policy to stop the harassment because we want to stop these cases not generate a bunch of litigation because someone wants to wait 10 months and participate in the harassment and then her husband blows the whistle and now we've got a lawsuit and I want all this money but you don't get there until you determine is he a supervisor we submit that he's not and the district court looking at what the 10th Circuit did it's a question of law you can't have a question of fact about it well are the facts there to support it and I submit his job description doesn't support it what he was doing doesn't support it and her testimony that she worked a regular 40 hour week and remember his testimony between the 5 days and 6 days he said I was trying to maintain a 40 hour work week that is the testimony of someone who's just trying to keep the 40 hour work week not someone who says I can call her on Thursday or not there's no evidence that he had that power in fact did that let me ask you another question somewhat related to this subject the time sheets that are in here is there something in them that helps your case I didn't understand what I was supposed to get out of all these times those go with David Duncan's second declaration when she says well he brought me in earlier and he says well wait a minute you were going to work 5 days a week or 6 days we deliver mail 6 days and on the week she worked 6 days you're going to come in later is this every time sheet for her these are the 16 weeks that she worked the 6 day week does this include the first weeks she was there I don't know we were rebutting coming in late that's what that was all about and I wish now to put them all in they're just a window of the time sheets aren't they they're just a small group of the time sheets the week she worked 6 days and it was intended to rebut her claim that coming coming in late does not automatically mean you lose pay and the record shows from his declaration she came in later because she was going to work a 6 day week and look you can see not only did she get her 40 hours in each of those days she even made a little bit of overtime I'd like to switch back to we're not going to give up on him not being a supervisor but even if he is a supervisor then we look at whether the employer is entitled to have the affirmative defense of Farragher and Ellerth and that will depend on did he in fact impose a tangible employment action on this employee because even with a supervisor if they didn't impose a tangible employment action which is an action that is so significant that is known or should be known to higher management so it becomes the act of the corporate entity itself and that's where McCafferty said a scheduler who can adjust hours that's the control over day to day work activities that the Supreme Court specifically rejected and the dissent acknowledged that is being rejected today the control over this and so at the time we argued this in the district court McCafferty loomed large the 10th circuit said a scheduler just being able to rearrange hours that's not enough to be a tangible employment action you get the affirmative defense McCafferty is a 10th circuit case and it was unpublished unpublished yes sir but as I said the law is developing under Vance it just came out in June of 2013 and McCafferty I believe was really the only circuit court case that addressed control over hours did Duncan have the authority to determine whether or not Ms. McInitial however you pronounce it came to work at all I don't think the record says that the record he says he schedules hours and then in his second declaration he makes clear I'm scheduling her and everyone between 5 weeks and 6 weeks to maintain a 40 hour work week where is the evidence that he was asked directly or a supervisor could David Duncan have caused her to sit home so your position is that statement in the brief is not supported by the evidence no the statement in the plaintiff's brief is not supported by the evidence no she says specifically that he changed her work status when she didn't participate referring to participating in the sexually explicit text message she said he brought her in later in the day I'll tell you what she said which I thought we had to believe that he changed her work status when she didn't participate and for fear I would be retaliated against if I did not and she said he gave me favorable treatment when I did comply he gave me favorable treatment when I did comply favorable when she complied unfavorable sounds to me like that's in the record your honor but how is that a significant that's what she said we have to accept that we can't accept what your guy said if it's contrary to this he said he's giving her 40 hours a week regardless that doesn't sound like that here he changed my work status when I didn't participate he gave me favorable treatment when I did where's the significant change in that testimony what hours how much money is involved what significance there is of these roots I don't know you guys are supposed to be the experts the change in the roots is not a significant well not standing alone you're probably right but you have to look at the whole picture I think the supreme court said you don't look at the whole picture anymore you got a list of factors and that's it we're rejecting the control the EEOC guidelines of looking at everything the supervisor could do or has done I submit they're rejected you got a specific list of factors that's what you look at and but you're one below on the supervisor point right wasn't that the main point that Judge Cogburn threw this thing out on well it was two factors he said that she's not a supervisor and then he jumped into the Ellerth affirmative defense this is the perfect kind of case and he also said there was no tangible employment act to get to the affirmative defense we have to show that there was no actual tangible employment action imposed now if he's not a supervisor we don't even go to the affirmative defense we go to a negligence standard and this whole business of well Ms. Meadows complained the station manager came and he stopped it and then he did the right thing went back to her and said now tell me what's going on is everything okay she said I lied and told him everything was fine well you're looking at the employer's negligence did they do the right thing they followed up and here this lady in a statement submitted for this litigation is saying well I lied and told him everything was fine well the employer did the right thing we have case law that says in the first instance of the reporting the first person you're dealing with you go and talk to them you stop it you talk to the victim and that's enough and there's no evidence in the record that Ms. Vance excuse me Ms. McInish knew anything about Ms. Meadows when she was suffering in silence and not reporting this I asked her in her deposition why did you not report this and she did not once say because of what happened to Ms. Meadows I knew it was pointless because they ignored her and let her be abused why didn't you report this not once in her deposition testimony did she say because he told me he was going to fire me or punish me if I didn't do it her statements were that I didn't report it because well I don't know I had an EEOC charge I just didn't want to make trouble right or wrong well that was just my mindset I don't like controversy didn't she say I didn't want to get him in trouble at one point she corrected me on that in the deposition she said I didn't want to cause trouble when I said didn't you say you didn't want to get him in trouble she said I didn't want to cause trouble and you know I'd like to just come back to what we're looking at this whole business of vicarious liability and you're one of the first circuits that's going to be analyzing a fact pattern under Vance whether or not they're the supervisor and it's not just whether he is a supervisor is he the type of supervisor that is going to make this employer subject to vicarious liability a strict liability and there are all kinds of supervisors with the name supervisor and their job title and the point is going some kind of a supervisor because the post office calls him that no question about that you're saying he's not the kind of supervisor that the Vance case contemplates that's your position the post office calls him a supervisor and we know that he set her rates and he told her when to come to work at least yes wait are you agreeing with that that he determined whether or not she came to work that's not what he said, he said her schedule he said her schedule Judge King said that he set her rates and determined whether she would come to work and you said yes well then I stand corrected I think you said when to come to work no I don't I don't agree to that he was a scheduler of the type that I think McCafferty was looking at the 10th circuit and says he controlled just the mere controlling of hours is not going to rise to the level of the supervisor whose acts are going to be attributed to the employer to create vicarious liability because what does vicarious liability do it potentially says no affirmative defense for you these people can just not report this for months, years no affirmative defense that's a serious consequence of deciding who is or is not a supervisor under Vance and I think the district court got it right in this case the district court looked at McCafferty 10th circuit decision and found he's not a supervisor but also said there was no tangible employment action no significant change in her job benefits on this record and we ask that you affirm the district court thank you alright reply test, reply, argument just a couple of points to bring up the defense relies on McCafferty quite a bit and I think this case is pretty distinguishable from McCafferty that's that 10th circuit case? yes, yes sir that's unpublished? we don't even rely on our own unpublished case laughter and in this case the position description clearly states establishes work schedules and allocates work hours allocates work hours as I understand it you're hanging your hat on hours, hours of work control in McCafferty he said it wasn't he didn't have the authority, in McCafferty it was you work this shift or that shift but it wasn't a control of the hours, they had a minimum number he wasn't setting their hours it was today you're working the fryer, tomorrow you're working the cash register it was much less authority than in this case in determining whether and how many hours an employee gets in a given day or week so we think that the cases are pretty distinguishable and the issue of I believe that Mr. Taylor said that in his mind docking or docking pay is a disciplinary matter I mean the case certainly doesn't say that, it just says docking of pay, it doesn't necessarily define it as disciplinary or not but certainly it's our belief that Mr. Duncan had the ability to tell somebody or to not call somebody in if you didn't feel that they were doing as good a job as one of the other conditional employees I agree with you that he is a supervisor don't you have a problem at the next step, how have you met your burden to establish that there was a tangible employment action taken against her well tangible doesn't necessarily mean adverse I think there's a distinction between it means significant change in employment status according to the case law so how have you met your burden of showing that there was a significant change in her employment status by participating in the texting and what not with him she benefited, she got more hours than she would have gotten otherwise her own testimony is not rebutted by the defendant who's Kim Taylor Kim Taylor is a co-worker a co-worker, there's a statement in here on page 183 in that appendix of Kim Taylor who says he would bring her in late at 10 and the rest of the TE's, that's what she was right temporary employee would be starting at 730, she would always get the worst route and when she would question the supervisor she'd be told that's the hell it is, the reason I know this we would question why she would get dumped on all the time, I've worked for the post office for 15 years plus years and I've never seen someone treated as poorly as she was treated this was affected her personality, she was very withdrawn and quiet, no one could figure it out what was wrong until this came out that's a co-worker, that's what I thought correct, Ms. Taylor is a co-worker it's like I said it's our belief that the reason they use the term tangible employment because most title 7 cases it's adverse employment action, in this it's tangible employment action which means it could be a benefit or an adverse action you can be hired, if you do this I'll hire you, if you do this I'll give you more work and more hours and it's our position that because she did cooperate, she did receive more hours, so it was only a benefit there was no adverse there was for a matter of a couple of weeks initially and then she did cooperate my understanding is this is a different situation than what we normally see, normally there's a refusal then there's punishment, in this case there's not a refusal, there's an acceptance and then your position is what goes on from then is in effect a hostile work environment because she's having to engage in this sexual banter with her supervisor yes, that's exactly it and so that's our position on the tangible employment status, or tangible employment benefit, we believe that he's clearly a supervisor I mean, I don't he controls her hours he reviews her performance, he can he can propose adverse actions, this circuit actually in a case that came out after this appeal was filed forgive me for not remembering the name Boyer-Liberto versus Fontainebleau Fontainebleau Corporation even goes as far as to saying that somebody the employer need not have the final say the employee need not have the final say as to the intangible employment action, instead the employee's decision may be subject to approval by higher management. Did those words sound familiar Judge King? Judge King wrote that, didn't he? I did see that your honor, so so in this case, I mean in that case I think that was more I think this case is more clear cut for called a supervisor, he controlled her hours he Mr. Taylor says he didn't control her hours, I think I have a question where he answered yes and he changed it before I talked about that the position description he says he didn't control her hours the position description says allocates work hours so, I mean it's in the record, it's pretty clear that he she never, ever said he determined whether or not I came to work or not and I could, I looked all through the record I could not find any evidence that he told her whether or not to come to work what she said was he controlled my hours, if I didn't, that's right how many hours I worked if I participated I would get 40, if I didn't I'd get 20, which is did she say that? if I didn't I'd get 20? is that in this record somewhere? I'm sorry, that's from the district court opinion I'm sorry, that was an example no, no that was an example that the district court gave in an oral argument no, she said if I participated I got my full hours if I didn't, he cut my hours and the cutting of hours affects her pay she's an hourly employee, not getting to work affects her pay and I don't know that there can be, short of a more tangible employment benefit than how much money you earn again, short of being outright terminated from your position I think that would be the next step is controlling your pay well, the problem you've got is that while that might be a good argument the Supreme Court used very specific words hiring, firing, failure of promote, so, you know, they didn't give us a broad definition they gave some very narrow terms that's why we're here, I guess it is I mean, he does have some authority to propose take some disciplinary action, propose other disciplinary action I mean, he is her first line supervisor anybody higher up is going to have to rely on what he says to make a decision as to whether to terminate her, they don't see her working day to day thank you very much for the benefit of the audience, we have a tradition in the 4th Circuit to come down and shake hands with the lawyers after arguments, one is to let them know there's no hard feelings of them, even though we asked you some hard questions, two, it's a chance to speak to some old friends that we haven't seen in a long time, so we're going to come down and greet the lawyers and then we'll take a short break before we start the next case applause
judges: William B. Traxler, Jr., Robert B. King, Stephanie D. Thacker